## SCOTT ET AL. VS. WATKINS.

One who has bought land upon credit of a purchaser at tax sale, and taken his bond for title, may file a bill for confirmation of the tax title, under the statute.

The purchaser at tax sale being dead, his heirs, executors, &c., need not be made parties to the bill for confirmation.

Nor need the complainant show that he is in the actual possession of the land, it being wild and unimproved, (*Bonnell vs. Roane*, 20 *Ark.* 114.)

If the proof were not satisfactory that the sheriff made and filed the affidavit required of him by law as assessor of taxes, yet, having acted as such, and there having been no proceedings to declare his office vacant, this court would be loth to hold, in a controversy to which he is not a party, that his acts as assessor *de facto*, were null and void, with all due respect for the opinion of the Supreme Court of the United States, in *Parker et al vs. Overman*, 18 *How.* 137. But no decided opinion is given on this point.

The last clause of sec. 3, chap. 38, Rev. Statutes, applies to licenses and privileges taxed for State purposes, and not to lands, or other property.

In an advertisement of lands for sale for taxes, the transposition of the sums due for State and for county purposes, is not an error that affects the validity of the sale.

It was not the intention of the act of 8th January, 1845, merely to repeal the penalty to which the defaulting non-resident tax-payer was subject under *sec.* 79, *chap.* 128, *Rev. Statutes,* and to leave him liable to no penalty for default, but the act changed the time at which the penalty was to be incurred, the officer by whom it was to be charged, the mode of advertising the lands for sale, &c.

The act was repealed by the act of 27th November, 1846, and sec. 79 and 80, chap. 128, Rev. Statutes revived, but before its repeal, and while it was in full force, the land in controversy became chargeable with the taxes which the owner should have paid upon it for the years 1845–6, together with the penalty of 25 per cent upon the amount thereof, for his failure to pay the taxes at the time prescribed by the act ; and the taxes and penalty so in arrear, and constituting a debt due to the State, and a charge upon the land, were collectable under the laws in force in 1849, when the land was offered for sale and forfeited to the State.

The statute providing for the collection of the penalty of 25 rer cent. upon the taxes due from the defaulting non-resident land owner, is not in violation of the compact between the State, and the United States, which declares that in no case shall non-resident proprietors be taxed higher than residents.

Nor is it in conflict with the 10th section of the Bill of Rights, because it provides for no judicial ascertainment of the delinquency, upon which the penalty or forfeiture, is made to attach.

*Appeal from Pulaski Chancery Court..*

Hon. HULRERT F. FAIRCHILD, Chancellor.

FOWLER & STILLWELL, for appellants.

For appellants we submit, that :

1st. Watkins was not entitled to a decree, not being within the statute. *Smith vs. Robinson,* 13 *Ark.* 563.

2d. The forfeiture was void because for more than was due. 13 *How. U. S. R.* 24; 19 *Ohio.* 237; 8 *Blackf. R.* 336, 582.

3d. Taxes are not due till assessed. 26 *Penn. S. Rep.* 437; 4 *Watts* 352; 1 *Munf.* 430.

4th. The county tax in 1854–5, &c., was for too much. *Dig. sec.* 1, 2, 3, *p.* 213.

5th. No penalty could be laid on taxes of 1845 and '46. *Acts of* 1846, *p.* 25. The repeal destroyed the right to the penalty. 1 *Hill.* 330; 5 *Cr.* 281; 4 *Dal.* 372; 1 *Binn.* 601; 8 *Watts* 517.

6th. The penalty law is void because in conflict with the compact; and with the constitution. *Cons. sec.* 2, *art.* 10; 2 *Kent's Com.* 13 ; 4 *Dev. Rep.* 1 ; 10 *Yerg.* 59 ; 3 *Story on Const.* 661.

7th. The error in the list required to be filed, and advertisement, (*sec.* 95 *and* 96, *chap.* 139 *Dig.*) was fatal. 4 *McLean* 483; 15 *Ohio* 134, 144.

8th. A confusion of the taxes is always fatal ; and if one tax is wrong the sale is void. *Black. on Tax Title* 195; 15 *Mass.* 147, 272.

WATKINS & GALLAGHER, for the appellee.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

On the 5th of November' 1849, the south half of section 26, township 2 south, range 11 west, was offered for sale, by the collector of Pulaski county, for the taxes, penalty and costs charged thereon for the years 1844 to 1849, inclusive, and struck off to the State for want of any other bidder. On the

9th of February, 1852, Alfred Wallace purchased the land at the Auditor's sale, and obtained the Auditor's deed therefor in the usual form. He afterwards sold it to George C. Watkins, who filed a bill in the Chancery Court of Pulaski county for confirmation of Wallace's tax title.

James A. Scott and wife, Calvin M. Thompson and others, heirs, &c., of David Thompson, deceased, who claimed title to the land under John R. Fitchneal, the original patentee, were permitted to make themselves parties, and interpose objections to the confirmation of the tax title ; but on the final hearing, their objections were overruled, the tax title confirmed ; and they appealed from the decree.

1. It was objected by the appellants that Watkins had not such title to the land as gave him the right to maintain a bill for confirmation.

Watkins purchased the land from Wallace, 9th July, 1855, for $1.280, payable in one year, with the privilege of extending the credit for five years, by paying the interest annually ; and Wallace executed to him a sealed instrument reciting the terms of the sale, and covenanting to make him a deed, on payment of the purchase money, with special warranty of title against all persons claiming under Wallace.

The application for confirmation was made at the February term, 1857, after six months public notice ; and after the death of Wallace.

The statutory remedy for confirmation of title, is given to " *the purchasers, or the heirs and legal representatives of purchasers of lands*" at judicial and tax sales. *Gould's Dig., chap.* 170, *sec.* 1.

We think, as did the Chancellor, that Watkins was the *legal representative* of Wallace within the meaning of the statute. It would be an exceedingly technical and narrow construction of the terms employed in the statute, to hold that Watkins could not proceed for confirmation of the tax title until he obtained the *legal* title to the land from Wallace.

Nor was it necessary to make the heirs and executors of Wallace parties to the bill, as insisted for appellants.

2. Nor is it a valid objection to the right of Watkins to maintain the bill that he was not in the actual posession of the land, which was wild and unimproved. *Bonnell vs. Roane*, 20 *Ark.* 114.

3. It was alleged in the response of the appellants, that Danley, the sheriff of Pulaski county, did not make and file in the office of the Clerk of the County Court, on or before the 10th of January, 1849, the affidavit required by statute, (*Eng. Dig., Ch.* 139, *Sec.* 7,) for the faithful performance of his duties as assessor, etc.; and that consequently the assessment of the land in question by him, in that year, and all of the subsequent proceedings based thereon, were null and void, etc.

It was proven on the hearing, by depositions, that Danley made and filed the affidavit in the form and within the time prescribed by the statute; and that it was put, by the clerk, with a bundle of similar affidavits, which had been mislaid, and could not be fonnd.

Tax titles would be exceedingly precarious if their validity was made to depend upon the preservation of official affidavits deposited in the clerk's office, but not recorded, or the memory of witnesses that they were made in the form, or filed within the time prescribed by law.

If the proof had not been satisfactory that Danley in due time made and filed the affidavit required by law, yet having acted as assessor for the year, 1849, and there having been no proceedings to declare his office vacant, (*State vs. Carneall,* 5 *Eng. R.* 161,) we should be loth to hold in a controversy to which he is not a party, that his acts as assessor *de facto*, were null and void, with all due respect for the opinion of the Supreme Court of the United States, in *Parker et al. vs. Overman* 18 *How.* 137. See *Black. on Tax Titles p.* 122. But it is not necessary to give any decided opinion on the point in this case.

4. The next objection is, that the county taxes assessed upon the lands for the years 1844, 1845 and 1846, were excessive, or at a higher rate than authorized by law.

It appears that the county court of Pulaski county fixed the rate of county tax, upon the value of lands etc., for each of said years, at three eighths of one per cent. and that the land in dispute was assessed, upon a *minimum* valuation of $3 per acre, at that rate for those years.

By sections 1 and 2 of Chap. 128, of the *Revised Statutes* an *ad valorem* tax of one eighth of one per cent. was fixed upon lands and personal property, made subject to taxation, for State purposes.

By *section* 1 *of Chap* 38 *Rev. Stat.*, certain objects of taxation for county purposes are specified, and *section* 2 of the same chapter, provides that, in addition to the objects of tax. tion mentioned in *Sec.* 1, " the several county courts shall have power to levy such sum as may be annually necessary to defray the expenses of the several counties, etc., on all the objects of taxation for State purposes," etc. But the power thus conferred is limited by section 3, which provides that " the county tax levied in any one year, shall not exceed the *one-half of one per cent.* on the assessed value of the property made taxable for State purposes."

These provisions of the *Revised Statutes* were in force during the years 1844–5–6, and the county court of Pulaski county had discretionary power, under them, to levy a tax for county purposes as high as *one-half of one per cent.* upon the value of lands etc., taxable for State purposes; but it fixed the county tax for those years at but *three-eighths* of one per cent., and consequently did not exceed its authority. It is manifest that the last clause of section 3, (*Ch.* 38, *Rev. Stat.*) applies to licenses and privileges taxed for State purposes, and not to lands, or other property.

5. The fifth objection is, that there was an error in the advertisement, etc.

It appears that the State tax assessed upon the land for the years 1844 to 1849, inclusive, was $10 80, to which a penalty of twenty-five per cent. was added, making $13 50; and that the county tax for the same years was $18 00, to which

a like penalty was added, making $22 50.   But the collector in advertising the land for sale, transposed the sums, and put the State tax and penalty at $22 50, and the county tax and penalty at $13 50 ; and this error of transposition was carried into the list of lands returned as forfeited to the State for want of bidders.   In all other respects, the advertisement seems to have been in good form.  The land was assessed as the property of a non-resident.   The statute requires the advertisement to state the time and place of sale, the owner's name, a description of the land, the taxes charged thereon for the current and preceding years, with a penalty of twenty-five per cent on the amount of taxes due.   *Eng. Dig. Ch.* 139, *Sec.* 95–6–7.

The statute does not require the advertisement to state the sums of the State and county taxes severally, though it is perhaps customary to do so.   If the advertisement had stated the aggregate amount of taxes due upon the land, with the penalty added, it would have been sufficient, we think, without setting forth what sum was due for State, and what for county taxes.

From the advertisement in question the aggregate amount of taxes and penalty charged upon the land was ascertainable by the simple process of adding the two sums stated as State tax and penalty, and county tax and penalty, together; and it is not perceived how the owner of the land, or any person interested in the sale, could have been prejudiced by the transposition of the two sums in the advertisement.   If the land had been sold for the aggregate amount of taxes and penalty charged upon it, the appropriation of the money between the State and the county would have been a matter for the collector ; and the tax book, on which the sum due to each was correctly stated, would have been his guide, as it would have been in settling with the owner of the land, had he offered to pay the taxes before the sale.   To hold the forfeiture of the land to the State void for an error in the advertisement so immaterial and harmless in its character, as the one in question, would be a departure from the rule of interpretation furnished by the statute (*Gould's Dig.*

36

*Ch.* 148, *Sec.* 131,) and which the court has repeatedly approved and followed.

6. The *sixth* objection is that a penalty of twenty-five per cent. was added to the taxes charged upon the land for the years 1845 and 1846, under *Sec.* 79, *Ch.* 128 of the *Rev. Stat.*, which stood repealed during those years.

If the act of January 8th, 1845, (*Pamph. Acts* 1844, *p.* 68,) had simply repealed the section of the *Revised Statutes* referred to ; and there had been no statute in force prescribing the same penalty for non-payment of taxes, etc., until it was revived by the *act of 27th Nov.* 1846, (*Pamph. Acts* 1846, *p.* 25) the penalty added to the taxes charged upon the land for the years 1845 and 1846, might have been illegal and excessive, as insisted for appellants. But such was not the case.

By *section* 79, *Ch.* 128 *Rev. Stat.*, each collector was required, on or before the 15th of September of each year, to make and file in the clerk's office, a list of lands assessed to non-residents, charging therein the taxes due for the current and preceding years, with a penalty of twenty-five per cent. upon the amount of taxes due.

By *section* 80 *Ib.* the collector was required to advertise the list of lands, so made out, to be sold on the first Monday of November following, unless the taxes, penalty etc., should be paid before the time of sale.

In other words if the non-resident land owner failed to pay the taxes assessed upon his land, to the collector, by the 15th of September, he was charged with twenty-five per cent. upon the amount of taxes due, as a penalty for his default, and the land was subject to be advertised and sold as well for the penalty so incurred, as for the taxes.

By the *act of 8th January*, 1845, non-resident land owners were allowed to furnish the Auditor with lists of their lands, and pay the State and county taxes chargeable thereon directly into the State treasury, or to furnish the lists to the assessors, and pay the taxes to the collectors, of the counties in which the lands were situated, at their election. It was made the duty of

the collector of each county, on or before the first Monday in August of each year, to make out and transmit to the Auditor a list of lands assessed to non-residents, on which the taxes had not been paid to the collector by that time, stating the amount of taxes due thereon, etc. The Auditor was required to strike from the lists, so forwarded to him by the collectors, the lands upon which the taxes had been paid into the State treasury, and the remaining lands were subject to be advertised and sold for taxes, penalty, etc., the advertisement to be made out and published by the Auditor, as if by the collectors of the several counties in which the lands were situated. But the Auditor was required to charge upon the lands of each default- ing land owner a penalty of twenty-five per cent. upon the amount of taxes due, for failing to pay the taxes into the State treasury, or to the collector of the proper county, on or before the return of the list to the Auditor above referred.

*Section* 8 *of the act* repeals sections 79 *and* 80 *of Ch.* 128, *Revised Statutes*, and declares that the lands etc., of non-resi- dents should not thereafter be advertised or sold for taxes by the collector, until the list had been reported to, and examined by the Auditor; and the lands should then be advertised as afore- said, and sold in accordance with existing laws for taxes, *penalty* and costs, if not paid before the day of sale etc.

Thus it will be seen that it was not the intention of the *act of 8th January*, 1845, merely to repeal the penalty to which the defaulting non-resident tax-payer was subject under *section* 79 *Ch.* 128, *Rev. Stat.*, and to leave him liable to no penalty for default, but that the act changed the time at which the penalty was to be incurred, the officer by whom it was to be charged, the mode of advertising the lands for sale, etc., etc., as above shown.

The entire act was repealed by the act of 27th November, 1846, and *sec.* 79, *and* 80, *Ch.* 128, *Rev. Stat.* revived, but before its repeal and while it was in full force the land in controversy became chargeable with the taxes which the owner should have paid upon it for the years 1845 and 1846, together with the

penalty of twenty-five per cent. upon the amount thereof for his failure to pay the taxes at the time prescribed by the act; and the taxes and penalty so in arrear, and constituting a debt due to the State, and a charge upon the land, were collectable under the laws in force in 1849, when the land was offered for sale, and forfeited to the State. *Blackwell* 195.

True the act under which the penalty for the years 1845 and 1846 occurred, was repealed when the land was offered for sale, but the repealing act, as above shown, revived the two sections of the *Revised Statutes*, which provided for the collection of the penalty upon all taxes in arrear. 5 *Cranch* 283.

7—But it is insisted for appellants, that the statute providing for the collection of the penalty of twenty-five per cent, upon the taxes due from the defaulting non-resident land owner, is in violation of that provision of the compact between the State and the United States, which declares that in no case shall non-resident proprietors be taxed higher than residents. *Gould's Dig. p.* 65–6.

The land in question was assessed and forfeited in the name of Fitchneal, as a non-resident, but whether he was a non-resident of the State, or not, does not appear. The act applies to all non-residents of the county in which the lands are situated and assessed, whether they reside within, or beyond the limits of the State. But it may be conceded, for the benefit of appellants, that he was a non resident of the State when the land was assessed, and when it was forfeited for non-payment of the taxes and penalty.

The rate of taxes upon all lands subject to taxation for State purposes, for the years 1844 to 1849, inclusive, was prescribed by law, and was equal and uniform, without discrimination—as to the residence of the owner. *Rev. Stat. Ch.* 128, *Sec* 12; *Eng. Dig. Ch.* 139, *Sec.* 1–2. And the record, in this case, shows that the county court of Pulaski county attempted to make no distinction between resident and non-resident proprietors, in fixing the rate of taxation for county purposes, in those years.

The *twenty-five* per cent. which the law directed the collector

to add to the amount of taxes due from the non-resident pro-
prietor, if his taxes were not paid by the 15th of September,
cannot be regarded, we think, as an additional tax, within the
meaning of the provision of the compact referred to, but as a
penalty imposed upon him for his delinquency in not paying the
taxes charged upon his land within the time prescribed by law.

The law subjects the resident delinquent land-holder to dis-
tress of goods, and seeks to quicken the diligence and insure
promptness of payment on the part of the non-resident, who is
supposed to have no goods within the reach of the collector, by
holding over him the terror of a penalty.

8. But it is moreover submitted by appellants, that if the
twenty-five per cent. be not regarded as a tax upon the land,
but as a penalty for the failure to pay the tax within the time
prescribed, the act is in conflict with the 10th section of the *Bill
of Rights*, because it provides for no judicial ascertainment of
the delinquency upon which the penalty, or forfeiture, is made
to attach.

If the act is void for the reason urged, all of our revenue stat-
utes which empower a ministerial officer to proceed to sell the
goods and lands of the delinquent tax-payers without regular
judicial proceedings—without the judgment of his peers etc.,
etc.—must fall for the same reason.

If the State had to proceed by regular suit, trial, judgment
and execution, according to the forms of law, through the judi-
cial tribunals, against every delinquent tax-payer, in order to
subject his property to the payment of the taxes charged upon
it, the government might become impotent, and perish for the
want of means to support it.

So if the State was compelled to ascertain, by judicial in-
quest, that the non-resident tax-payer had failed to pay his taxes
within the time fixed by law, and thereby incurred the penalty
prescribed, a wise policy would dictate that it were the better
economy for the State to abandon the penalty, than to incur the
labor and cost of collecting it through the courts.

The mode of enforcing the payment of taxes, and incident

penalties, must, in the nature of things, be summary and prompt, through ministerial agents; and it was hardly within the contemplation of the framers of the *Bill of Rights* to require the government to proceed, through the tedious forms of the courts, to force from the reluctant tax-payer the contributions required of him by law, for its support.

It is true that the delinquency upon which the penalty in question is made to attach, is to be ascertained by the collector, who is required to return a list of the delinquencies, with the penalties attached, to the clerk's office, whereby they become matters of record, and to proceed to collect the taxes and penalties by sale of the lands, yet his ascertainment of the delinquency is by no means final and conclusive upon the tax-payer. On the contrary, if he has in fact paid his taxes within the time prescribed by the act, and is no delinquent, notwithstanding he has been returned by the collector as such, and the collector is proceeding to make sale of his land for the taxes, and penalty added thereto, he may arrest his proceedings, by applying to the proper court, where he is at liberty to show that he was not delinquent: Or he may permit the land to be sold, and the purchaser to obtain the collector's deed, and yet in any judicial proceeding, where the validity of the deed is called in question, he, or any one claiming through him, may prove that he was no delinquent, and thereby avoid the deed.

With this privilege to the tax-payer to assert, and protect his rights through the courts, the power vested by the act in the collector to ascertain and declare the delinquency, without judicial inquest, and to collect the taxes and penalty by sale of the land, so essentially necessary to meet the wants of the government, cannot be regarded as unreasonable, or oppressive to the tax-payer. See *Blackwell p.* 536, *and cases cited; Sedgwick on Stat. & Const. L.* 97.

In this case it is not pretended that the taxes charged upon the land, and for which it was forfeited to the State, were ever paid by any one.

The decree of the court below must be affirmed.

Mr. Justice FAIRCHILD did not sit in this case.